IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 4, 2016


IN RE AIDEN R., ET AL.


**Appeal from the Juvenile Court for Sullivan County**
**No. J40021     Mark Toohey, Judge**

_____


**No. E2015-01799-COA-R3-PT**
**FILED-JUNE 23, 2016**

_____


This case arises from the dismissal after trial of a petition to terminate the parental rights of a mother and father. The juvenile court concluded that, although the Department of Children's Services had proven grounds for terminating the parents' rights, termination was not in the best interest of the children. On appeal, we find the Department of Children's Services did not prove by clear and convincing evidence statutory grounds for termination of the father's rights. We further find clear and convincing evidence supports only two statutory grounds for terminating the mother's rights. Because clear and convincing evidence does not support a finding that termination would be in the children's best interest, we affirm the decision of the juvenile court to dismiss the petition to terminate parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY and BRANDON O. GIBSON, JJ., joined.

Marsha Arnurius, Johnson City, Tennessee, for the appellant, Guardian ad Litem.

Herbert H. Slatery III, Attorney General and Reporter, and M. Cameron Himes, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Randall D. Fleming, Kingsport, Tennessee, for the appellee, Joseph G.

Nicholas A. Schaefer, Kingsport, Tennessee, for the appellee, Mary R.

# OPINION

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mary R. ("Mother") and Joseph G. ("Father") are the biological parents of three children, Aiden, born June 2004, Chance, born January 2010, and Analyse, born October 2012. In August 2012, the Tennessee Department of Children's Services ("DCS") received a report concerning Aiden's behavior. DCS began providing services to the family in an effort to keep the children in the home. At that time, both parents were unemployed and on probation for prior felony convictions.[1] Subsequently, DCS received notice that both parents had been incarcerated. Mother was arrested for failure to pay child support[2] and Father for failure to pay court costs and probation fees associated with his prior conviction.

The Juvenile Court for Sullivan County, Tennessee, entered a protective custody order granting temporary legal custody of the children to DCS as of November 18, 2012. After a preliminary hearing on January 17, 2013, the juvenile court found probable cause to believe that the children were dependent and neglected as stated in the petition. Although an adjudicatory hearing was held, the hearing did not result in the immediate entry of an order adjudicating the children dependent and neglected.[3]

On January 31, 2014, DCS filed a petition to terminate the parental rights of Mother and Father. The petition alleged Father abandoned the children by willful failure to support. As to both parents, the petition alleged abandonment by an incarcerated parent, abandonment by failure to provide a suitable home, substantial noncompliance with the permanency plan, and persistent conditions prevented the children from being returned to either parent. The juvenile court held a hearing on the petition over multiple days, beginning January 12, 2015, and concluding July 6, 2015.

### A. PROOF AT THE HEARING

DCS and the parents developed the initial permanency plan on December 10, 2012. The plan had the twin goals of return to parent and adoption. The plan required

---

[1] Father was convicted of theft, forgery, and felony failure to appear in 2009. Mother was convicted of theft and forgery in 2007 and aggravated burglary, theft, and felony failure to appear in 2011.

[2] Mother has other children, not in her custody, who are not part of the current case.

[3] Although the petition to terminate parental rights alleges the children were adjudicated dependent and neglected on January 17, 2013, DCS concedes on appeal that this record does not contain evidence of a judicial finding that the children were declared dependent and neglected.

the parents to comply with and pass random drug screens, refrain from criminal activity, remain in compliance with all laws and court orders, complete mental health intake assessments and follow recommendations, sign releases for medical and other service providers, notify DCS before filling narcotic prescriptions, complete a parenting assessment and follow recommendations, maintain appropriate housing[4] and adequate legal income, and exhibit appropriate parenting skills. The plan also required Mother to complete an alcohol and drug assessment and follow all recommendations.

In February 2013, both parents completed the required parenting assessment. The parents revealed to the counselor their problems with domestic violence, substance abuse, and mental health. The counselor recommended that Father complete a 12-step program with a sponsor, attend a support group, complete assessments for anger management and alcohol and drug abuse, participate in counseling, and receive hands-on parenting education. The counselor also recommended that Mother attend a substance support group; complete a focused anger management assessment and follow all recommendations; participate in counseling, anger management and parenting classes; receive hands-on parenting education; and complete individual and family therapy and an alcohol and drug abuse program.

Shortly after completing the assessment, the parents, who were not married to each other, separated. Father went to live with his sister, and Mother moved in with friends. Both remained unemployed. Neither parent had a driver's license. DCS determined the sister's home was inappropriate for the children because of its small size and the presence of cigarette smoke. Two of the children are allergic to smoke. At the hearing, Father promised to quit smoking if he regained custody of the children.

DCS arranged for therapeutic visitation with the children. A licensed counselor provided parenting advice and assistance during the visits. During the initial visits, Mother exhibited appropriate behavior, other than fighting with Father, while Father had difficulty managing the children and failed to supervise them. At the termination hearing, the parenting supervisor testified that while Father was receptive to instruction, he continued to struggle with implementing what he learned, even after two years of parenting education.

While both parents had a history of substance abuse, Father claimed he had not used illegal drugs in several years. Mother admitted she has been addicted to opiates for at least seven years. She started going to a suboxone clinic in 2012 and, at the time the children entered foster care, was paying two or three hundred dollars each month for Klonopin and Subutex, which were prescribed. Although she was unemployed, Mother explained that she "did whatever it took" to get the cash to pay for her prescriptions.

---

[4] Mother and Father lived in a trailer with a severe roach infestation and a sizeable hole in the kitchen floor. They also lacked basic necessities such as mattresses for the boys' beds and a crib.

Mother was arrested again in March 2013 for a probation violation. On her way to jail, she was discovered with pills and subsequently convicted of possession of controlled substances and introduction of controlled substances to a penal institution. Mother admitted she "made a bad choice" in trying to bring narcotics into jail. After this conviction, Mother's probation was revoked. Mother has remained in jail since April 23, 2013.

DCS revised the permanency plan in May 2013 to include the recommendations from the parenting assessment. Because both parents were incarcerated at the time, the case manager took copies of the revised plan to each parent and explained the provisions. The plan was subsequently revised again to include recommendations from the parents' psychological assessments. The additional recommendations in the revised plan included parenting classes and an alcohol and drug assessment for Father and alcohol and drug treatment, parenting classes, and individual and family therapy for Mother.

While in jail, Mother completed a program through Families Free that provided substance abuse, anger management, and parenting classes. She also completed her psychological and alcohol and drug assessments. She passed all of her drug screens. She continued to visit with the two younger children, albeit in a limited fashion due to her incarceration.[5] Mother's incarceration prevented her from continuing her hands-on parenting education. She did not join a substance abuse support group or participate in individual, couples, or family counseling because those programs were not available in jail. The DCS case manager agreed that Mother completed as many of her responsibilities under the permanency plan as she could while incarcerated.

Mother agreed her life choices have not been in the best interest of her children. She did not refrain from criminal activity as required by the permanency plan. She had been arrested fourteen times since 2008. She expected to be released from jail in December 2015, if not earlier on parole. After her release, she did not plan to continue her relationship with Father, and she intended to live with an aunt. However, she conceded that she had no plan for how to provide for the children after her release. Mother expressed her intention to participate in an after-release program offered by Families Free, which provides former inmates assistance in obtaining housing and employment as well as treatment for substance abuse and recovery support.

Father was released from jail in June 2013, but other than participating in therapeutic visitation, he waited over a year to begin working on his responsibilities in

---

[5] During Mother's incarceration, the parenting supervisor brought the younger children to the jail, where they could speak to and see Mother using a phone and video monitors. The supervisor testified continuing visitation had been difficult given the constraints of Mother's current incarceration. The juvenile court suspended visitation with the oldest child upon recommendation of his therapist.

the permanency plan. He explained, "I wasn't in the right state of mind to do it." He acknowledged failing drug screens in February, August, and September 2013.

Since that time, Father has attended anger management, domestic violence, and parenting classes. Father's alcohol and drug assessment had no recommendations. He completed an alcohol and drug program in March 2014 and passed all of his recent drug screens. He also started individual counseling but had difficulty keeping his appointments because of a lack of transportation. At the time of the hearing, DCS had arranged for him to begin in-home counseling. Father did not start a 12-step program or obtain a sponsor; he testified that he did not believe it was necessary.

Father explained his arrests during this case have been for probation violations,[6] namely a failure to pay court costs and probation fines. He testified he owed approximately $2,000 in court costs and incurred $45 per month in probation fees.

During the pendency of this case, Father, at various times, worked as a cook and a construction worker and at other unspecified odd jobs. He also had periods of unemployment. He applied for social security disability, but his claim was denied. In April 2014, Father began work as a cook at Waffle House with net pay of $300 per week. Although he lost the Waffle House job after he was arrested in June 2014, he was rehired after his release that November.

Father acknowledged he is under a court order to pay $200 a month for child support. He estimated his current child support arrearage at $1,000. Father made several child support payments since the children entered foster care. He paid $979.19 in 2014 and $1,109.22 in March 2015. Father testified he was unable to pay child support during the four months preceding the filing of the termination petition because he was unemployed and had applied for disability benefits.

Father planned to move into a two-bedroom trailer. He testified he had already paid a deposit, but he had not yet moved in or arranged for electrical service. He testified the rent would be $400 per month, including water.

Both the DCS case manager and the in-home counselor for Camelot Care Center, which provided foster care services, testified regarding the children. While in custody, Aiden was diagnosed with PTSD and reactive attachment disorder. He had monthly medical appointments and weekly therapy. Despite this, he was still having behavior issues in school and was physically aggressive with his brother Chance. Because of the sibling conflict, Aiden was placed in a separate foster home, although DCS was working to find a home that could accommodate all three children. The in-home counselor

---

[6] Some of his probation violations were for failure to pay probation fees and court costs while others were for failure to notify his probation officer of arrests or changes of address.

testified that when Aiden is in a structured environment, his behavior improves. She also testified he worries about his parents and sometimes reacts negatively after visitation.

When the hearings on the petition to terminate commenced, Chance had just turned five years old but was not yet potty-trained. He received weekly speech therapy for a severe speech delay. He suffered from allergies to smoke and several foods as well as asthma.

Analyse came into custody when she was two months old. She was also allergic to smoke and some foods. As she grew older, she exhibited anger issues. DCS asserted that Analyse had no relationship with Mother due to her incarcerations after Analyse's birth. During visits, Analyse was uncomfortable with Father at first but had come to accept him.

The in-home counselor testified all three children needed stability, consistency, and love. They also needed specialized attention for their health and behavioral needs. The children had been in three foster homes during the pendency of this case, although they had moved four times. The case manager testified that, unless the parents' rights were terminated, DCS's ability to find an adoptive home would be limited.

## B. JUVENILE COURT'S FINAL ORDER OF GUARDIANSHIP

The juvenile court entered a final order on August 25, 2015, dismissing DCS's petition. The court ruled DCS had proven by clear and convincing evidence two grounds for termination of Father's parental rights: abandonment by willful failure to support and abandonment by failure to provide a suitable home. With regard to Mother, the court determined DCS had proven all alleged grounds for termination of her parental rights. The court found, however, "[t]hat the overriding best interest of the children based on the findings of fact detailed above shows that it would not be in the children's best interest to terminate the parental rights of [Father] and therefore also not in their best interest to terminate the parental rights of [Mother]."

The guardian ad litem appeals. The guardian ad litem argues that there was clear and convincing evidence of two additional grounds for terminating Father's parental rights: substantial noncompliance with the permanency plan and persistence of conditions. The guardian ad litem also argues that there was clear and convincing evidence that termination of Father's and Mother's parental rights was in the children's best interests.

DCS, while acknowledging that some grounds for termination were not proven by clear and convincing evidence, argues that there was clear and convincing evidence that Mother abandoned her children by exhibiting a wanton disregard for their welfare and that she was in substantial noncompliance with the permanency plans. DCS argues that

6

there was also clear and convincing evidence that Father abandoned his children by failure to support and that he was in substantial noncompliance with the permanency plans. DCS also contends that termination was in the children's best interests.

## II. ANALYSIS

Termination of parental rights is one of the most important decisions courts make. As noted by the United States Supreme Court, "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *Santosky v. Kramer*, 455 U.S. 745, 787 (1982). Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian." Tenn. Code Ann. § 36-1-113(*l*)(1) (Supp. 2015).

A parent has a fundamental right, based in both the federal and State constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putman v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In re Adoption of a Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). While fundamental, parental rights are not absolute. The State may interfere with parental rights, through judicial action, in some limited circumstances. *Santosky*, 455 U.S. at 747; *In re Angela E.*, 303 S.W.3d at 250.

Our Legislature has identified those situations in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g) (Supp. 2015). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and parental rights may be terminated only where a statutory ground exists. Tenn. Code Ann. § 36-1-113(c)(1) (Supp. 2015); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of a statutory ground for termination and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c) (Supp. 2015); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). This heightened burden of proof is one of the safeguards required by the fundamental rights involved. *See Santosky*, 455 U.S. at 769. The heightened burden serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *In re Bernard T.*, 319 S.W.2d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *Id.* at 596 (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing evidence standard establishes that the truth of the

facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

On appeal, we review the trial court's findings of fact de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. In termination proceedings, "the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993). We "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525 (Tenn. 2016), *petition for cert. filed sub. nom*, *Vanessa G. v. Tenn. Dep't of Children's Servs.*, (U.S. Apr. 22, 2016) (No. 15-1317).

## A. GROUNDS FOR TERMINATION

DCS alleged five different grounds for termination of parental rights. DCS alleged the first ground, abandonment by willful failure to support, only against Father. DCS alleged the remaining four grounds against both parents.

### 1. Abandonment by Willful Failure to Support

The juvenile court found Father had abandoned the children through his willful failure to pay child support.[7] "Abandonment is defined as the willful failure to visit, to support, or to make reasonable payments toward the support of the child during the four-month period preceding the filing of the petition to terminate parental rights." *In re Adoption of Angela E.,* 402 S.W.3d 636, 640 (Tenn. 2013); *see also* Tenn. Code Ann. § 36-1-102(1)(A)(i) (Supp. 2015). Here, because the petition was filed on January 31, 2014, the relevant four-month period is September 30, 2013, to January 30, 2014. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the day before the petition is filed is the last day in the relevant four-month period).

---

[7] Father argues that DCS failed to properly plead abandonment by willful failure to support because a heading in the petition cites to statutory provisions dealing with visitation. We find Father's argument unpersuasive. The factual allegations in the petition for termination provided clear notice that DCS was alleging abandonment by willful failure to pay child support, and even if that had not been the case, the ground was tried by implied consent. *See In re Alysia S.*, 460 S.W.3d 536, 564 (Tenn. Ct. App. 2014), *perm. app. denied*, (Mar. 16, 2015).

Whether a parent failed to support a child is a factual question, but whether the failure was willful for the purposes of the parental termination statute is a question of law. *In re Malaki E.*, M2014-01182-COA-R3-PT, 2015 WL 1384652, at *6 (Tenn. Ct. App. Mar. 23, 2015). "The element of willfulness has been held to be both a statutory and a constitutional requirement." *In re C.T.B.,* No. M2009-00316-COA-R3-PT, 2009 WL 1939826, at *4 (Tenn. Ct. App. July 6, 2009). "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.,* 182 S.W.3d at 864.

While Father admitted he did not pay any child support during the relevant period even though he was aware of his obligation to pay, failure to pay is not enough to establish willfulness. We must determine whether Father had the financial ability to pay support. *In re Mackenzie N.*, No. M2013-02805-COA-R3-PT, 2014 WL 6735151, at *6 (Tenn. Ct. App. Nov. 26, 2014), *perm. app. denied*, (Feb. 20, 2015). Thus, we must review Father's income and available resources. *See In re Adoption of Angela E.,* 402 S.W.3d at 641.

During the relevant time period, Father had no source of income other than some unspecified odd jobs. Willful unemployment can equate to a willful failure to support. *See In re Austin D.,* No. E2012-00579-COA-R3-PT, 2013 WL 357605, at *11-12 (Tenn. Ct. App. Jan. 30, 2013) (mother's personal choice not to work contributed to the conclusion that she willfully failed to pay child support). DCS had the burden of proving Father's lack of full-time employment was voluntary. *See In re M.P.J.*, No. E2008-00174-COA-R3-PT, 2008 WL 3982912, at *10 (Tenn. Ct. App. Aug. 27, 2008) (affirming lower court's finding of willful failure to support in light of evidence father had turned down offered employment).

On this record, we conclude DCS failed to carry its burden of proving Father's failure to pay support was willful. The only evidence in this record concerning Father's efforts to find employment or his ability to work during the relevant four-month period was the following exchange between DCS's attorney and Father:

> Q. Okay? So the four months before [the petition to terminate was filed], did you pay any child support?
>
> A. No, Sir. But I was right on -- I eventually signed up for disability.
>
> Q. Uh-huh.
>
> A. And I was going to give up my disability and go back to

9

work, but I was told -- everybody was telling me that if anybody deserves disability, it was me and to keep on trying. So I kept on trying. They turned me down, and I went straight back to work.

Q. Okay. So you was [sic] able to work then? You're working now? You went back to work after that?

A. Yes, Sir.

From this testimony, we cannot determine whether Father was agreeing that he was not disabled, that he was currently employed, or that he went back to work after his disability claim was denied.  DCS points us to the testimony of its case manager, who when asked if there was any reason Father could not have worked during the applicable time period, testified "[n]ot that I'm aware of."   We find the proof insufficient to support the juvenile court's finding that Father was capable of working and paying child support during the four-month period.  *See In re Noah B.B.,* No. E2014-01676-COA-R3-PT, 2015 WL 1186018, at *9 (Tenn. Ct. App. Mar. 12, 2015) (holding that the petitioner must do more than simply prove the parent was not disabled during the relevant time frame).

## 2.  Abandonment by Failure to Secure a Suitable Home

The juvenile court also found Mother and Father abandoned their children by failing to provide a suitable home.  *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii) (Supp. 2015).  An essential element of this ground for termination is proof that "[t]he child has been removed from the home of the parent[s] . . . as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department . . . ." *Id.*  Where the parents have not admitted this element, the petitioner has the burden of proving it.  "[T]he mere suggestion or possibility of an order adjudicating the child dependent and neglected is not good enough." *In re R.L.M.*, No. E2013-02723-COA-R3-PT, 2015 WL 389635, at *3 (Tenn. Ct. App. Jan. 29, 2015).

DCS concedes on appeal that it did not establish this essential element, and we agree.  The record contains certified copies of the protective order removing the children from the home on November 18, 2012, and the January 17, 2013 order finding probable cause that the children were dependent and neglected, but no order adjudicating the children dependent and neglected.[8]   The juvenile court noted this discrepancy and

---

[8] This Court has previously explained the process followed in dependency and neglect cases and the different burdens of proof for preliminary hearings and adjudicatory hearings:

The statutes and rules governing procedure in the juvenile courts

ordered DCS to file the order as a late-filed exhibit to the hearing. A thorough search of the appellate record has not revealed the order. As a result, the record does not support the statutory ground of abandonment by failure to provide a suitable home.

3. Abandonment by Incarcerated Parent

The juvenile court also found Mother had abandoned the children through her incarceration and her pre-incarceration conduct. [9] To establish this ground for termination, DCS was required to prove "[a] parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv) (Supp. 2015).

"Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *In re Audrey S.,* 182 S.W.3d at 865-66. Incarceration, by itself, is not enough to meet this statutory definition. The court must also find, by clear and convincing evidence, "that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the

provide for three types of hearings in cases where a child is alleged to be dependent, neglected, or abused: (1) preliminary hearings; (2) adjudicatory hearings; and (3) dispositional hearings. The function of the adjudicatory hearing is to determine whether the allegations of dependency, neglect, or abuse are true. The court's finding that a child is dependent, neglected, or abused must be based on clear and convincing evidence. The purpose of the dispositional hearing, which follows the adjudicatory hearing, is to determine the proper placement for a child who has been found to be dependent, neglected, or abused.

As its name implies, a preliminary hearing occurs prior to both the adjudicatory hearing and the dispositional hearing. Its function is to allow the juvenile court to decide whether the child should be removed from the parent's custody pending the adjudicatory hearing. The juvenile court is allowed to consider reliable hearsay in making its decision, and it can order the child removed from the parent's custody based on a finding of "probable cause" that the child is a dependent, neglected, or abused child.

*In re Audrey S.,* 182 S.W.3d at 874-75 (citations omitted).

[9] The juvenile court determined Father had "not abandoned the children by his incarceration or exhibited a wanton disregard for their welfare." DCS concedes on appeal that it did not meet its burden of proving this ground as to Father. We agree. Father was not incarcerated during the requisite time period.

11

child." *Id.* The court may consider all evidence relevant to determining "whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.*

We find, as did the juvenile court, clear and convincing evidence that Mother abandoned her children by exhibiting wanton disregard for their welfare. Mother was incarcerated during the requisite time period and has engaged in behavior exhibiting a wanton disregard for the welfare of her children. Mother admitted she had been incarcerated fourteen times since 2008. She has an extensive history of criminal behavior, including felony convictions for aggravated burglary, theft, forgery, and failure to appear. Her probation was revoked based on multiple violations, including an attempt to bring controlled substances into the jail. Mother has been addicted to opiates for at least seven years. At the hearing, she admitted her life choices have not been in the best interest of her children. We have previously held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867-68.

4. Substantial Noncompliance with Permanency Plan

Although DCS alleged both parents were in substantial noncompliance with the permanency plan, the juvenile court determined DCS had only proven this ground of termination as to Mother. *See* Tenn. Code Ann. § 36-1-113(g)(2). Before analyzing whether a parent complied with the permanency plan, the court must find that the permanency plan requirements that the parent allegedly failed to satisfy are "'reasonable and related to remedying the conditions which necessitate foster care placement.'" *In re Valentine,* 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C) (2014)). If the permanency plan requirements are reasonable, the court must then determine if the parent's noncompliance was substantial. *Id.* at 548-49. The unsatisfied requirements must be important in the plan's scheme. *Id.* A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.,* 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004).

We find many of the permanency plan requirements reasonable and related to remedying the conditions that led to her children's removal. As noted above, among other things, the plan required the parents to comply with and pass random drug screens, refrain from criminal activity, sign releases for medical and other service providers, notify DCS before filling narcotic prescriptions, complete a parenting assessment and follow recommendations, maintain appropriate housing and adequate legal income, and exhibit appropriate parenting skills. The plan also required Mother to complete an alcohol and drug assessment and follow all recommendations.

12

We must determine whether Mother's noncompliance with these reasonable requirements is substantial in light of their importance to the overall plan. *In re Valentine*, 79 S.W.3d at 548-49. Our focus is on the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes. *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009). Mother submitted she completed all the responsibilities she could while incarcerated, and the case manager agreed. "An incarcerated parent is not absolved of his or her parental responsibilities while in jail or prison. However, incarceration is a relevant consideration when judging that parent's ability to fulfill his or her responsibilities to the child." *In re Jonathan F.,* No. E2014-01181-COA-R3-PT, 2015 WL 739638, at *13 (Tenn. Ct. App. Feb. 20, 2015).

Although we credit Mother for her efforts while incarcerated, we find clear and convincing evidence that Mother failed to comply with the reasonable responsibilities contained in the permanency plan. Mother acknowledged in her testimony that her children were removed because her living conditions were unsuitable and she was incarcerated. Proof at the hearing established that Mother did not refrain from criminal activity. In fact, she was incarcerated at the time of the hearing without a definite time frame for release. Her incarceration prevented her from accomplishing other reasonable responsibilities of the permanency plan, such as obtaining housing and source of support and exhibiting appropriate parenting skills. We conclude these failures amount to substantial noncompliance with the requirements of the permanency plans.

With respect to Father, we conclude that the proof does not rise to the level of clear and convincing evidence of substantial noncompliance with the requirements of the permanency plans. While Father was slow in complying, by the time of the hearing, he had accomplished or begun work on the majority of the requirements. Improvements in compliance are construed in favor of the parent. *In re Valentine,* 79 S.W.3d at 549. The only responsibilities Father had not attempted by the time the hearing commenced were participation in a 12-step program, joining a support group with a sponsor, and participation in family or couples counseling. We attach little weight to the 12-step program and support group responsibilities because those recommendations resulted from a very brief parenting assessment. In addition, DCS presented no proof that Father's drug use led to removal of the children. *See id.* at 548. The record reflects Father's alcohol and drug assessment had no recommendations, Father passed his recent drug screens, and he could not participate in the required counseling while Mother remains incarcerated.

5. Persistence of Conditions

Finally, the juvenile court found DCS had proven persistence of conditions as a ground for termination of Mother's rights. *See* Tenn. Code Ann. § 36-1-113(g)(3). An essential prerequisite to establishing persistence of conditions is evidence of a "prior court order removing the child from the parent's home . . . based on a judicial finding of

dependency, neglect or abuse." *In re Audrey S.,* 182 S.W.3d at 874. As discussed previously, the record does not include the order adjudicating these children dependent and neglected. The January 17, 2013 order finding probable cause to believe the children were dependent and neglected is insufficient. *See id.* at 874-75 (explaining the difference between the levels of proof required in the preliminary hearing and the adjudicatory hearing stages).

DCS concedes on appeal that it did not meet its burden of proof on this ground. The guardian ad litem argues that the juvenile court erred in not terminating Father's rights, as well as Mother's, based on persistence of conditions. We find insufficient evidence to establish the statutory ground of persistence of conditions given the absence of a prior order removing the children from the parents' home based on a judicial finding of dependency, neglect, or abuse.

## B. BEST INTEREST OF THE CHILDREN

Because we have concluded DCS failed to prove any statutory ground for termination of Father's parental rights, we need only consider whether termination of Mother's parental rights would be in the best interest of the children. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. Because "[n]ot all parental misconduct is irredeemable, . . . Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005); *see also In re A.J.R.*, No. E2006-01140-COA-R3-PT, 2006 WL 3421284, at *9 (Tenn. Ct. App. Nov. 28, 2006) (concluding the record lacked clear and convincing evidence that termination of Mother's parental rights would be in the best interest of the children); *In re C.B.W.,* No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *11 (Tenn. Ct. App. June 26, 2006) (concluding "the drastic step of terminating Mother's rights" was unnecessary to ensure the child's well-being).

The best interest determination is necessarily fact-intensive, *In re Audrey S.,* 182 S.W.3d at 878, and involves a consideration of statutory factors.[10] Tenn. Code Ann. §

_____

[10] The statutory factors, which are not exhaustive, include the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been

14

36-1-113(i). "Because denial of a petition to terminate parental rights does not in and of itself affect the custody of a child, *In re Valentine,* 79 S.W.3d at 550, the court's task is not to choose between two home situations. Instead, the inquiry should address itself to the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.,* 2006 WL 1749534, at *6. Ultimately, the burden of proof on this issue rests with DCS, not the parent opposing the petition. *Id.* at *11. Like the statutory grounds for termination, clear and convincing evidence must prove that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d at 546.

We conclude the proof in this record does not clearly and convincingly establish that termination of Mother's parental rights is in the best interest of the children. DCS presented little to no proof concerning the impact on the children of terminating Mother's parental rights. The children have a variety of health and behavioral needs, but they were doing well in their foster care placement and receiving the necessary services. They had been living in their current foster homes since August 2014. At the time of the hearing, these foster homes were not adoptive. In fact, the case manager testified the main motivation behind DCS's petition to terminate parental rights was a desire to broaden the search for potentially adoptive parents. While permanence for these children is one of the primary goals, severing forever the children's relationship with Mother will not necessarily achieve that end, especially in light of the fact that grounds for terminating Father's rights were not proven.[11] It remains to be seen whether Father will be able to

---

established between the parent or guardian and the child;

    (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

    (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

    (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

    (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

    (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

[11] The court found "[t]hat the overriding best interest of the children based on the findings of fact . . . shows that it would not be in the children's best interest to terminate the parental rights of [Father]

15

regain custody.

"[W]hether return to the parent's home is likely to be possible in the near future is an important part of the best interest analysis when the alternative is long term foster care." *In re C.B.W.*, 2006 WL 1749534, at *8. While Mother has not yet made a lasting adjustment to her circumstances, we cannot find, based on the record before us, that Mother would be unable to make a lasting adjustment in the near future. She took significant steps in the right direction while incarcerated. The DCS case manager agreed Mother had accomplished as much as she could to change her circumstances while incarcerated. The case manager also admitted that Mother had the ability to properly parent her children when she was not incarcerated and not impaired.

We also note Mother's relationship with her children. DCS presented proof that Mother had not been able to establish a relationship with her youngest child prior to Mother's incarceration. However, there was proof of a loving bond between Mother and Aiden and Chance.

### III. CONCLUSION

We modify the decision of the juvenile court insomuch as we find no statutory grounds for terminating Father's parental rights and we find grounds for terminating Mother's parental rights only based upon abandonment by an incarcerated parent under Tennessee Code Annotated § 36-1-102(1)(A)(iv) and substantial noncompliance with the permanency plan under Tennessee Code Annotated § 36-1-113(g)(2). However, because we conclude DCS did not prove by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the children, we affirm the juvenile court's dismissal of the petition to terminate parental rights.

_____
W. NEAL MCBRAYER, JUDGE

---

and therefore also not in their best interest to terminate the parental rights of [Mother]." However, a finding that terminating one parent's rights is not in a child's best interest does not preclude a finding that terminating the other parent's rights is in the child's best interest.

16